**Opinion issued December 12, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00391-CV**

_____

**HARRIS COUNTY, Appellant**

**V.**

**HASAN GOKAL, Appellee**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-60942**

---

**MEMORANDUM OPINION**

During the COVID-19 pandemic, Dr. Hasan Gokal took home an opened vial of leftover vaccine doses that were about to expire, and he gave the doses to at-risk friends and family. Harris County then terminated his employment. According to Gokal, another Harris County employee told him in the meeting during which he

was fired that he did not equitably distribute the vaccine and gave it to "too many people with Indian sounding names." The county asserted he was fired for taking the vaccine doses home without permission. Gokal sued the county, claiming race discrimination. We conclude that, assuming Gokal established his prima facie case of race discrimination, he failed to show the county's legitimate, nondiscriminatory reason for his firing was a pretext or that discrimination was another motivating factor. Therefore, we reverse and render judgment dismissing the case for lack of jurisdiction.

## BACKGROUND

The undisputed facts are that on December 29, 2020, the first day of Harris County's mass distribution of the COVID-19 vaccine, Gokal was working for the county as an emergency physician in Harris County Public Health Department's Office of Public Health Preparedness and Response Division. He was working as the on-site manager at one of the county's mass vaccine distribution sites. After the site had closed for the day, there were still ten doses of the vaccine remaining in an opened vial. The doses would expire and become unusable around midnight that night. Gokal offered the remaining doses to on-site staff, but everyone had either already been vaccinated or declined to be vaccinated.

In an effort not to waste any doses of the vaccine, Gokal took the unused doses home to Fort Bend County and began calling friends and family to find at-risk people

2

whom he could vaccinate. He called his wife, his mother, and two friends, and they referred him to several at-risk people, some of whom Gokal had never met before. He administered all ten doses to elderly or otherwise at-risk people, including his wife, who had a significant health condition. Gokal completed the vaccination records for each recipient and submitted the records for entry into the local and state tracking systems.

A few days later, Gokal told a coworker that he had taken the leftover doses home and given them to elderly friends of his mother. The employee reported this incident to management. Three Public Health Department managers met to discuss the allegation against Gokal and decide how to handle it: Michael McClendon, director of the Office of Public Health Preparedness and Response Division and Gokal's direct supervisor; Gwen Sims, the deputy or interim director for Harris County Public Health Department; and Ed Anderson, the director of human resources. According to McClendon, "We discussed that the vaccine had been taken from the [vaccination] site and—by Dr. Gokal and it had [gone] out of county and had been given to people in another county, and we needed to know if there was anything we needed to do about that." They agreed Anderson should investigate the allegation. Anderson explained that because he did not have access to patient records, to verify the allegation against Gokal, he asked another employee to look through the vaccination records "to see if she noted any signatures and/or names that

would be similar to Dr. Gokal's." She found 13 vaccination records of patients whom Gokal might have vaccinated.

Anderson presented his findings to McClendon, Sims, and Sheri Onyiego—the acting medical director. McClendon said that he, Sims, and Onyiego made the decision to terminate Gokal for taking the vaccine doses off-site.

McClendon and Anderson met with Gokal on January 7. The parties dispute what occurred during the meeting.

According to Gokal's original petition, McClendon and Anderson did not ask Gokal about his version of events. Instead, Anderson declared that Gokal did not "equitably" distribute the vaccine and that Gokal gave the vaccine to "too many people with Indian sounding names." McClendon and Anderson accused Gokal of stealing the vial of leftover vaccine doses. McClendon and Anderson fired Gokal at that meeting.

According to Anderson, he and McClendon wanted to give Gokal a chance to explain himself regarding the allegation that he took vaccine doses off-site. Anderson explained that McClendon, Sims, and Onyiego had determined before the meeting that if the allegation against Gokal was true, then Gokal should be fired. Anderson had prepared a termination letter to give Gokal if the allegation against him was true. Anderson said that Gokal admitted to taking the vaccine doses off-site and giving the doses to friends and family. Because Gokal admitted this, McClendon

4

and Anderson fired him. According to Anderson, they did not object to Gokal's giving the vaccine to other people; "[i]t was the taking it off-site without making a phone call to talk about what to do with the vaccine. He took it and gave it to friends and family, which from a county standpoint, you can't use county resources to benefit family members."

At the meeting, Anderson gave Gokal the already written termination letter stating in relevant part:

> We recently conducted an investigation that revealed you took COVID Vaccine home without permission and injected your friends and family. These findings have caused us to lose faith in your ability to perform your duties. Therefore, your employment with Harris County Public Health Services is ending today.

Gokal, who is of South Asian descent and Pakistani national origin, sued Harris County, alleging he had been discriminated against on the basis of his race and national origin. Harris County filed a plea to the jurisdiction and, in the alternative, motion for summary judgment, asserting its governmental immunity. The trial court denied the motion. Harris County appeals.

## DISCUSSION

### Plea to the Jurisdiction

Political subdivisions of the state like Harris County are immune from suit and liability unless the legislature expressly waives immunity. *Harris Cnty. v.*

*Annab*, 547 S.W.3d 609, 612–13 (Tex. 2018). Chapter 21 of the Labor Code,[1] which prohibits employment discrimination, waives immunity, but only when a plaintiff states a claim for conduct that violates that chapter. *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021). A political subdivision may assert its immunity through a plea to the jurisdiction or motion for summary judgment. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). The political subdivision may challenge the pleadings, the existence of jurisdictional facts, or both. *Id.* We review a plea to the jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).

When, as here, a political subdivision challenges the existence of jurisdictional facts, our review "mirrors that of a traditional summary judgment." *Lara*, 625 S.W.3d at 52 (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012)). A challenge to the plaintiff's jurisdictional facts implicates the merits of the plaintiff's claim, so the plaintiff has the burden to raise a genuine issue of material fact on each element of his claim. *Id.*; *Clark*, 544 S.W.3d at 805. "In determining whether a material fact issue exists, we must take as true all

---

[1] Though some courts still refer to this chapter as the Texas Commission on Human Rights Act, TCHRA, or CHRA, the Commission on Human Rights was replaced by the Texas Workforce Commission civil rights division. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 798 n.1 (Tex. 2010). Courts often use the terms "TCHRA," "Chapter 21," and "the Act" interchangeably in opinions discussing this chapter. *Id.*; *Jones v. Tex. Dep't of Pub. Safety*, No. 03-20-00615-CV, 2022 WL 318585, at *1 n.1 (Tex. App.—Austin Feb. 3, 2022, no pet.) (mem. op.).

evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Clark*, 544 S.W.3d at 771. "In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id.*

Typically, a party may only appeal from a final judgment or interlocutory order for which appeal is authorized by statute. *Mellon Real Est., Inc. v. Gomez*, No. 01-23-00611-CV, 2023 WL 8262778, at *1 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.) (mem. op.) (per curiam). Section 51.014(a)(8) of the Texas Civil Practice and Remedies Code authorizes an appeal from an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit" like Harris County. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8); *see also id.* § 101.001(3) (defining "governmental unit" to include county). Thus, we have appellate jurisdiction over this interlocutory appeal.

**Employment Discrimination**

Chapter 21 of the Texas Labor Code prohibits employment discrimination because of an employee's "race, color, disability, religion, sex, national origin, or age." *See* TEX. LAB. CODE § 21.051. The legislature enacted Chapter 21 in part to enforce the policies of Title VII of the federal Civil Rights Act of 1964. *Id.* § 21.001(1); *Lara*, 625 S.W.3d at 52. Therefore, we may also look to federal statutes

7

and the cases interpreting them to guide our reading of Chapter 21. *Lara*, 625 S.W.3d at 52.

A plaintiff can prove unlawful employment discrimination under Chapter 21 through either direct evidence or circumstantial evidence. *Clark*, 544 S.W.3d at 782. Here, Gokal asserts he has provided both.

Harris County raises one issue on appeal: whether the trial court erred in denying its plea to the jurisdiction. The county argues the trial court lacked jurisdiction over Gokal's race-discrimination claim because Gokal did not provide direct evidence of discrimination and did not establish a prima facie claim of race discrimination with circumstantial evidence, or, in the alternative, he did not rebut Harris County's legitimate, nondiscriminatory reason for his termination. Because Gokal failed to state a claim for race discrimination, the county argues, its immunity was not waived, and therefore the trial court should have granted its plea to the jurisdiction.

### A. Direct Evidence

Harris County argues Gokal did not provide direct evidence of race discrimination. Gokal alleged in his original petition that on the day he was fired, "Mr. Anderson declared that Dr. Gokal did not equitably distribute the vaccine and that Dr. Gokal gave the vaccine to too many individuals with Indian sounding names." He claims this comment is direct evidence of discrimination. We take as

true Gokal's assertion that Anderson made this comment. *See Clark*, 544 S.W.3d at 771. Harris County has not disputed that Anderson made the comment. Instead, Harris County explains the comment was Anderson's advice to Gokal as to how the media would perceive his actions, and he expressed no discriminatory animus toward Gokal's race or national origin.

*Applicable Law*

Direct evidence of discrimination is evidence that, if believed, proves an employer's discriminatory animus without inference or presumption.[2] *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020); *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 433 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Conversely, if an inference is required to prove the employer's discriminatory animus, the evidence is not direct. *Donaldson*, 495 S.W.3d at 433. Insults or slurs against a protected class are usually direct evidence of discrimination. *Id.*; *see also Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*,

---

[2] When an employee presents direct evidence of discrimination, we do not need to apply the *McDonnell-Douglas* burden-shifting framework for circumstantial evidence, discussed further below. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (explaining that *McDonnell-Douglas* test is inapplicable when plaintiff presents direct evidence of discrimination); *Clark*, 544 S.W.3d at 784 (explaining that burden-shifting framework is "a mechanism for proving discriminatory intent absent direct evidence"). Instead, after an employee presents direct evidence of discrimination, the burden of proof then shifts to the employer to show that "legitimate reasons would have led to the same decision regardless of any discriminatory motives." *Democratic Schs. Rsch., Inc. v. Rock*, 608 S.W.3d 290, 308 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

612 S.W.3d 299, 313 (Tex. 2020) (explaining that "specific expressions of negativity or animosity about a person's . . . protected status can constitute direct evidence to support a claim of illegal discrimination").

A workplace comment may be evidence of direct discrimination if the comment is: (1) related to the plaintiff's protected class; (2) proximate in time to the adverse employment decision; (3) made by a person with authority over the employment decision at issue; and (4) related to the employment decision at issue. *Clark*, 952 F.3d at 581; *Donaldson*, 495 S.W.3d at 433.

For example, a supervisor's comments to a woman who was demoted, stating she "wouldn't be worth as much as the men would be to the bank" and "she would be paid less *because she was a woman*," were direct evidence of discrimination. *Clark*, 952 F.3d at 579–80 (discussing *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994)). The comments of a casino manager who did not promote an African-American woman to a managerial position because he did not allow "dark skin black person[s to] handle any money at" the casino and he "thought [the employee] was too black to do various tasks at the casino" were direct evidence of discrimination. *Id.* at 580 (alterations in original) (discussing *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015)). Similarly, a casino manager's comments that "the[y] were not going to hire a black person unless there were extenuating circumstances" and that he had "been told not to hire

too many blacks in the poker room" were direct evidence of discrimination against an African-American applicant who was not hired. *Id.* (alteration in original) (discussing *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005)).

*Analysis*

Anderson's comment, though perhaps ill-advised, is not direct evidence of discrimination because his comment requires an inference to prove any discriminatory animus or that Gokal's race or national origin were factors in the employment decision.

Anderson's comment expressed no animus toward people "with Indian sounding names" directly, so we must infer that Anderson did not want that group to be vaccinated to find the comment discriminatory. In the same vein, Anderson's comment did not connect Gokal's race or national origin to his termination; we must infer that Anderson believed Gokal vaccinated people with "Indian sounding names" because Gokal himself is South Asian and Pakistani. And while Anderson's comment does allow for these troublesome inferences, the comment does not "directly and expressly link[]" Gokal's national origin to a decisionmaker's choice to terminate him. *See Clark*, 952 F.3d at 580.

Because an inference is required for this comment to prove discriminatory animus, the comment is not direct evidence. *See Donaldson*, 495 S.W.3d at 433.

11

Instead, it is circumstantial. *See id.* We proceed to analyze Gokal's circumstantial evidence.

**B. Circumstantial Evidence**

Harris County also argues that Gokal did not prove unlawful employment discrimination through circumstantial evidence.

*Applicable Law*

Because "smoking guns are hard to come by," a plaintiff may also prove unlawful employment discrimination with circumstantial evidence. *Clark*, 544 S.W.3d at 782. In that situation, courts employ the three-step *McDonnell-Douglas* burden-shifting framework. *See id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

In the first step, a plaintiff must produce evidence of a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. "To establish a prima facie case of race discrimination, the employee must show that he (1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of his protected class or others similarly situated were treated more favorably." *Donaldson*, 495 S.W.3d at 434. If the plaintiff establishes his prima facie case, a rebuttable presumption of discrimination arises. *Clark*, 544 S.W.3d at 782.

In the second step, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse employment action. *Donaldson*, 495 S.W.3d at 434. If the employer does so, the presumption of discrimination disappears. *Clark*, 544 S.W.3d at 782. The employer's burden at this stage is one of production and involves no credibility assessment. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002).

In the third step, the burden shifts back to the plaintiff to show either: (1) the employer's stated reason was false and a pretext for discrimination; or (2) the employer's stated reason, "while true, was only one reason for its conduct and discrimination is another motivating factor." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015) (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012)); *Clark*, 544 S.W.3d at 782; *Donaldson*, 495 S.W.3d at 435.

In considering whether the plaintiff has produced evidence to demonstrate pretext, the ultimate question is whether the plaintiff has produced sufficient evidence to demonstrate the falsity of the employer's stated reason, together with the plaintiff's prima facie case, to allow a jury to find discrimination was the reason for his termination. *Goudeau*, 793 F.3d at 478. The plaintiff must produce more than his subjective belief; he needs evidence of the stated reason's falsity. *See id.; Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021); *see also Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 581 (5th Cir. 2020) (collecting cases in

13

which evidence was sufficient to raise fact issue, including evidence such as disparate treatment, harassment, or prior positive performance reviews). Further, that evidence must directly address the employer's stated reason. *See Sandstad*, 309 F.3d at 899 (concluding plaintiff's evidence of pretext failed to create fact issue when evidence failed to address employer's stated reason for employee's termination).

Simply disputing whether the employer came to the correct decision in its assessment of the employee's performance is not enough to raise a fact issue as to pretext. *See Jones*, 8 F.4th at 369 (concluding employee's declaration that he did follow restaurant's recipe when employer fired him for not following recipe was insufficient to raise fact issue as to pretext); *Clark*, 544 S.W.3d at 792 (concluding employee's denial of employer's stated performance issues was insufficient to raise fact issue as to pretext); *McNeel v. Citation Oil & Gas Corp.*, 526 S.W.3d 750, 760 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (concluding employee's assertion that she did not violate code of conduct as employer stated was insufficient to raise fact issue as to pretext). An employer can be wrong or unreasonable in its assessment, so long as it does not act with discriminatory animus. *Sandstad*, 309 F.3d at 899 (stating employer "is entitled to be unreasonable" in its investigation of employee's conduct "so long as it does not act with discriminatory animus"); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003) (per curiam)

14

(stating at-will employer can fire employee for any reason or no reason, just not for illegal reason); *Tex. Dep't of State Health Servs. v. Resendiz*, 642 S.W.3d 163, 179 (Tex. App.—El Paso 2021, no pet.) (noting that in considering pretext, our "focus is not on whether the decision itself was error-free," but on whether employer in good-faith relied on stated reasons in making that decision). "The issue is whether the employer's *perception* of the [employee's performance] problems—accurate or not—was the real reason for termination." *Clark*, 544 S.W.3d at 792 (emphasis added); *see also Goudeau*, 793 F.3d at 476 (explaining that issue at pretext stage is whether employer's stated reason, "even if incorrect," was real reason for termination).

Similarly, an employer's imperfect investigation into an employee's conduct does not raise a fact issue as to whether the employer acted in good faith in relying on the outcome of the investigation. *Resendiz*, 642 S.W.3d at 179 (rejecting plaintiff's argument that employer did not conduct thorough investigation as evidence of pretext because "[e]ven if there were errors in the investigation, or it was not as thorough as [the plaintiff] would have liked," that alone did not raise fact issue as to pretext); *McNeel*, 526 S.W.3d at 760–61 ("Evidence of an imperfect or incomplete investigation is not sufficient to raise a fact issue regarding pretext.").

An employer's discriminatory comment can be evidence of pretext or another motivating factor sufficient to raise a fact issue at this stage. *See Goudeau*, 793 F.3d

15

at 475–76. In a circumstantial-evidence case, the comment must show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Id.* (quoting *Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 236 (5th Cir. 2015)); *see also id.* at 475 (noting that in circumstantial-evidence context, courts apply more flexible standard than in direct-evidence context). However, we must consider the comment in context. *See Squyres*, 782 F.3d at 236 (explaining that employer's comment did not show discriminatory animus when considered in full context); *Clark*, 544 S.W.3d at 771, 793 (explaining that in determining whether fact issue exists, we must consider "evidence necessary to show context" and that "[i]gnoring context is impermissible").

Although the burden of production shifts at each stage of the *McDonnell-Douglas* analysis, the burden of persuasion always remains with the plaintiff. *Clark*, 544 S.W.3d at 782; *Democratic Schs. Rsch., Inc. v. Rock*, 608 S.W.3d 290, 308 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

Each step of the *McDonnell-Douglas* framework is jurisdictional. *See Clark*, 544 S.W.3d at 783–84. Thus, to survive a plea to the jurisdiction after the employer has produced evidence of a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must produce evidence of pretext or discrimination as another motivating factor. *See id.*

*Analysis*

Harris County argues Gokal did not establish a prima facie case of discrimination, and even if he did, Harris County articulated a legitimate, non-discriminatory reason for his termination. The county further argues that Gokal did not provide evidence of pretext or discrimination as another motivating factor.

Assuming without deciding that Gokal did establish a prima facie case of discrimination, we proceed to the second step of the *McDonnell-Douglas* framework, whether Harris County produced a legitimate, nondiscriminatory reason for terminating Gokal's employment. *See Donaldson*, 495 S.W.3d at 434.

Harris County did so. Harris County's stated reason was Gokal's misconduct in taking the vaccine doses off-site, to another county, and administering the doses to his wife and other acquaintances.

In support of its stated reason, the county produced the termination letter that Anderson had prepared before the meeting with Gokal. Anderson said that he prepared the termination letter to give Gokal if the allegation was true that Gokal took vaccine doses off-site. The termination letter, which Anderson gave to Gokal during the meeting when he was fired, stated the county's finding that Gokal "took COVID vaccine home without permission and injected [his] friends and family," which caused the county "to lose faith in [Gokal's] ability to perform [his] duties." Gokal has admitted that he took vaccine doses home with him and administered them

17

to at-risk people, including his wife and people who were friends of his friends and family.

The county also produced deposition testimony from McClendon, Gokal's direct supervisor, and Anderson, the human resources director. McClendon confirmed that Gokal was terminated because he took at least one vial of vaccine doses home for personal use, which was not approved by Public Health Department leadership and could be considered theft.

Anderson stated:

> [W]e wanted to give [Gokal] due process and give him a chance to explain what happened based on the scenario that was presented by the employee. It wasn't until that point that once he admitted to the scenario of him taking the vial across town, giving it to friends and family, that we then determined that it was termination due to the trust—the lack of trust.

Because Harris County produced a legitimate, nondiscriminatory reason for firing Gokal, the burden shifts back to Gokal to show either: (1) Harris County's stated reason was false and a pretext for discrimination; or (2) the stated reason, while true, was only one reason for his termination and discrimination was another motivating factor. *See Goudeau*, 793 F.3d at 475; *Clark*, 544 S.W.3d at 782; *Donaldson*, 495 S.W.3d at 435.

**1. Falsity and Pretext of Harris County's Stated Reason**

As for the first factor, that Harris County's stated reason was false and a pretext for discrimination, Gokal has admitted the stated reason is true. He admitted

he took vaccine doses off-site and administered them to his wife and friends of his friends and family. He has not raised a fact issue as to whether Harris County's stated reason was false.

Nonetheless, Gokal asserts two arguments attempting to show that Harris County's stated reason was false and a pretext for discrimination. Even without considering his admission, his evidence does not raise a fact issue as to whether the stated reason is false.

*a. No Policy Violation*

Gokal argues that the county fired him for misconduct, which implies he violated an established standard or policy. He claims that Harris County never identified a specific standard he violated and that the county did not have a written policy regarding leftover vaccine doses at the time Gokal took them; therefore, he argues, the county's stated reason for his termination must be false. But Harris County did not claim that Gokal violated a specific standard or policy when he was fired, so the fact that the county never identified a specific standard or policy is not evidence of pretext. And although Harris County never produced evidence that it had any kind of policy or rule against taking vaccine doses home, an at-will employer may fire an employee for any reason, as long as the reason is not discriminatory. *See Canchola*, 121 S.W.3d at 740.

Gokal argues Harris County has attempted to articulate multiple after-the-fact justifications for his firing, which he claims are all evidence of pretext. However, the county has never abandoned its original explanation that Gokal was fired for taking vaccine doses home. The evidence of these shifting justifications Gokal cites either does not address the reason for his firing or confirms that the reason for his firing was taking the vaccine off-site without permission.

For instance, he claims the county's first justification was that he violated a Public Health Department policy, but discovery showed no such policy regarding opened vaccine doses existed. But the evidence he cites for this justification is the Harris County District Attorney's Office Public Integrity Division Investigation Report—not a document created by the Public Health Department or anyone involved in the termination decision—and it states, "Mr. Anderson advised that Dr. Gokal was terminated for policy violation. Mr. Anderson stated that a specific policy number was not listed in the termination letter, only that the letter stated that Dr. Gokal took something that wasn't his and gave it to friends and family." This confirms that Harris County did not terminate Gokal's employment for violating a specific policy but for taking the vaccine doses home with him, which was Harris County's stated reason.

Gokal claims the county's next justification was that it had a verbal policy or oral understanding, and he cites McClendon's deposition. When asked whether the

Office of Public Health Preparedness and Response Division had a policy on what should be done with a vial that had been opened and was nearing expiration, McClendon answered that, on December 29, there was no written policy but an oral understanding. He explained the oral understanding was that if there was an opened vial with leftover vaccine doses at the end of the day, staff should bring it back to the main office to find people qualified to receive the vaccine. Nowhere did he say Gokal was fired for violating this oral understanding. Later, when asked whether there was any basis for terminating Gokal's employment "other than the investigation into these vaccines which Dr. Gokal allegedly took off site," McClendon answered, "No."

Gokal claims the county's next justification was its assertion that he should have brought the vial back to the main office so people on the waiting list could receive the vaccine doses. He does not claim that Harris County stated this was a reason for firing him. The evidence he cites for this claim is the criminal indictment against him for theft prepared by the Harris County District Attorney's Office— again, not a document created by the Public Health Department or anyone involved in the termination decision. The indictment alleges McClendon "stated that Gokal was a county employee at the time that he took the vaccine off-site and vaccinated his family and friends." It goes on to allege that McClendon "explained that any vials that had been punctured and still contained viable doses of the vaccine were

supposed to be brought back to the main office." The next sentence says that McClendon "stated that Harris County Public Health personnel are not permitted to take vaccine doses for personal use." The indictment does not claim Gokal was fired for not taking the vial to the main office, but it confirms that McClendon believed Gokal should not have taken the vial home.

Construing Gokal's brief liberally, he also suggests that he had permission to take the vaccine doses home. In his discrimination charge filed with the EEOC, Gokal explained that he called Trey Frankovich, a senior analyst in the Harris County Public Health Department, before taking the vaccine doses home. Gokal said that he told Frankovich that he, Gokal, "was going to find individuals to give the vaccine to," and Frankovich responded, "OK, good." To the extent Gokal argues he in fact had permission to take the vaccine doses home, the record does not support that contention. According to Gokal's description of the phone call, he did not say he was taking the doses home, so Frankovich's response cannot be construed as permission to do so. Gokal only said that he was going to find people to give the vaccine to, which has never been the reason for his firing.

None of this evidence raises a fact issue as to whether Harris County's stated reason for Gokal's termination was false or a pretext for discrimination.

*b. Compliance with State and Federal Guidelines*

Gokal next argues he was complying with state and federal guidelines to avoid wasting vaccine doses when he found people to vaccinate rather than wasting those vaccine doses, so he did not commit any misconduct. But the sources Gokal cites do not authorize a person to take vaccine doses home to vaccinate people, as Gokal did, even though these sources encourage public health employees not to waste vaccine doses.

For instance, Gokal points out that Harris County's daily notes for December 28, 2020, state that "no one will be turned away" and that "the goal is to get everyone vaccinated" regardless of whether they are outside the county. In context, though, those statements read:

- "Sites will close when the lines are gone, no one will be turned away"; and

- "There will be an overlap in jurisdictions but will need to service in our jurisdiction, if other jurisdictions want to come with us, we should take them. The goal is to get everyone vaccinated."

*See Clark*, 544 S.W.3d at 771 (explaining that in determining whether material fact issue exists, we cannot disregard evidence necessary to show context). These statements indicate that people who showed up at the vaccination site should be vaccinated; they do not indicate Gokal was authorized to take vaccine doses from the vaccination site.

Similarly, an email from the chief state epidemiologist emphasizes the strong encouragement to vaccinate people as quickly as possible and not waste vaccine doses, but the email does not authorize employees to take vaccine doses from the vaccination site. The email explained:

> [W]e have also tried to make it clear that no doses of vaccine should be wasted. So, if a site has completely vaccinated all of the 1a population, they can feel free to vaccinate people in 1b, so that no doses are wasted. Likewise, if all 1b people that want vaccine have been vaccinated, then it would be ok to move onto other populations. We want to maintain the priority groups, but we also don't want wasted vaccine.

The record indicates the "1a population" included health care workers and first responders who might be exposed to COVID-19 through their work as well as residents of long-term health care facilities, and the 1b population included people 65 years and older and people with a chronic medical condition that put them at increased risk for severe illness from COVID-19. Gokal's pleading, which we take as true, explains that he could not find anyone from the 1a population at the vaccination site to vaccinate with the leftover vaccine doses at the end of the day, so he moved on to people in the 1b population. Harris County has not disputed that the people Gokal vaccinated were included in the 1b population.

But the stated reason for Gokal's termination was not vaccinating people in the 1b population too early; the stated reason was taking vaccine doses away from the vaccination site. *See Sandstad*, 309 F.3d at 899 (concluding employee's evidence

24

did not raise fact issue because it did not directly address employer's stated reason). Although the email encourages vaccine administrators not to waste vaccine doses, the email says that if "a site" has completely vaccinated one group, the site can move on to people in the next group. Nothing in this email indicates a vaccine administrator could or should remove vaccine doses from the site to administer the vaccines. Although there was general guidance not to waste vaccine doses, that guidance does not support taking vaccine doses off-site, as Gokal did.

Gokal has produced evidence that he complied with state and federal guidelines not to waste vaccine doses when he found at-risk people to receive the vaccine doses that otherwise would have gone to waste. In other words, he produced some evidence he did not engage in misconduct. But simply disputing an employer's assessment of an employee's conduct does not raise a fact issue as to pretext. *See, e.g.*, *McNeel*, 526 S.W.3d at 760 (concluding employee's assertion that she did not violate code of conduct as employer stated was insufficient to raise fact issue as to pretext). This evidence, then, fails to raise a fact issue as to whether Harris County's stated reason was false or a pretext.

Further, Harris County's stated reason for his termination was taking vaccine doses home and giving them to friends and family, not Gokal's noncompliance with state or federal guidelines. And while there was some tension between the guidance not to waste vaccine doses and the guidance to vaccinate priority groups as soon as

25

possible, Harris County could terminate Gokal's employment for an incorrect reason, just not a discriminatory reason. *See Sandstad*, 309 F.3d at 899 (stating employer "is entitled to be unreasonable" in its investigation of employee's conduct "so long as it does not act with discriminatory animus"); *Canchola*, 121 S.W.3d at 740 (stating at-will employer can fire employee for any reason or no reason, just not for illegal reason).

**2. Discrimination as Another Motivating Factor**

Gokal may also meet his burden at this stage by producing evidence raising a fact issue as to whether Harris County's stated reason for his termination was only one reason and that discrimination was another motivating factor. *See Goudeau*, 793 F.3d at 475. We conclude Gokal's evidence fails to do so.

*a. Anderson's Investigation into Patient Records*

Construing Gokal's brief liberally, Gokal argues that Anderson's investigation into patient records shows his discriminatory animus. According to Gokal, after Anderson learned of the allegation that Gokal took vaccine doses home and administered them to friends and family, Anderson "set out on [a] mission" to find those patient records, using "patient race and national origin as a main criterion for suspicion," and eventually expanding the search to include records with names that "potentially . . . looked Asian." Anderson's investigation identified 13 records

of patients whom Gokal might have vaccinated, and this included some patients whom he did not vaccinate.

But Anderson's investigation does not raise a fact issue as to whether discrimination was a motivating factor for Gokal's termination, because we must consider the context surrounding Anderson's investigation. *See Clark*, 544 S.W.3d at 771 (explaining that in determining whether material fact issue exists, we cannot disregard evidence necessary to show context). When we do so, we conclude that the investigation was not racially motivated as Gokal suggests. Anderson explained that, because he did not have access to patient records, he asked another employee to "look[] for documents that could be tied to friends and family where Dr. Gokal's name was there on that particular date."

In response to the question, "Did you ever notice that there were an unusual number of Pakistanis on these patient forms that were pulled?" Anderson answered in his deposition: "At some point looking at the forms, I mean, it—there was some that had indicated they were, you know, Asia Pacific Islander, and there were others that weren't checked at all. I think there was some familiarity with last names, so I think they were *potentially looked at as possibly being Asian* or Pacific Islander." Anderson in no way indicated that he told the other employee to search for names that "potentially looked . . . Asian," as Gokal suggests.

Instead, Anderson explained, they were looking for the particular date, December 29, and looking for Gokal's signature because "that would be the key indicator that [a vaccine was administered] off-site because he wasn't traditionally giving them on-site." He elaborated:

> We were looking for Gokal's name as a signature, the particular date, . . . . And then looking at the name . . . . I mean, did we notice it? Yes, I mean, it definitely was one thing that was an indicator, but it wasn't the sole—it wasn't the sole thing we were looking at. We were looking at the signature first because that indicated that he potentially did it off-site.

Anderson admitted his investigation was flawed because the employee found 13 patient records that met their search criteria, but Gokal said that he only administered 10 vaccine doses off-site. Anderson acknowledged the investigation "wasn't an exact science," and that he was only "trying to do part of [his] investigation to at least get some validity" to the allegation that Gokal took vaccine doses home before he and McClendon met with Gokal. When asked whether, in his investigation, he concluded that Gokal gave the vaccine doses to friends and family, Anderson answered that yes, he did, because Gokal admitted to it.

When considered in context, Anderson's investigation does not show he acted with discriminatory animus. This evidence, therefore, fails to raise a fact issue as to whether discrimination was another motiving factor for Gokal's termination.

Even though Anderson's investigation was flawed, the flawed investigation does not raise a fact issue as to whether Harris County acted in good faith in relying

28

on the outcome of the investigation, to the extent it did rely on the outcome. *See Resendiz,* 642 S.W.3d at 179 (rejecting plaintiff's argument that employer did not conduct thorough investigation as evidence of pretext because "[e]ven if there were errors in the investigation, or it was not as thorough as [the plaintiff] would have liked," that alone did not raise fact issue as to pretext); *McNeel*, 526 S.W.3d at 760–61 ("Evidence of an imperfect or incomplete investigation is not sufficient to raise a fact issue regarding pretext."). And ultimately, the outcome of Anderson's investigation was immaterial because Gokal admitted to committing the same conduct that Anderson's investigation concluded he did—vaccinating friends and family members, off-site, without permission. Thus, Anderson's investigation does not raise a fact issue as to whether discrimination was another motivating factor for Gokal's firing.

### b. Anderson's Comment in Termination Meeting

We must also consider Anderson's comment that "Gokal did not equitably distribute the vaccine and that Dr. Gokal gave the vaccine to too many individuals with Indian sounding names," which he made during the meeting in which Gokal was fired. We have already concluded that this comment is not evidence of direct discrimination, but we must also determine whether it is circumstantial evidence of discrimination.

29

To raise a fact issue as to whether discrimination was another motivating factor, the comment must show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Goudeau*, 793 F.3d at 475–76 (quoting *Squyres*, 782 F.3d at 236). According to Gokal, Anderson said "that Dr. Gokal did not equitably distribute the vaccine and that Dr. Gokal gave the vaccine to too many individuals with Indian sounding names."

But, when considered in context, *see Squyres*, 782 F.3d at 236; *Clark*, 544 S.W.3d at 771, Anderson's comment does not show a discriminatory animus or raise a fact issue as to whether discrimination was a motivating factor for Gokal's termination.

As we discussed above, Anderson's comment allows for the inferences that Anderson did not want people "with Indian sounding names" to be vaccinated or that Gokal was unduly giving preference to people with "Indian sounding names" because Gokal was also of South Asian descent. But the context in which Anderson's comments were made disproves that Anderson intended either of these meanings. In his deposition, Anderson explained:

> This part about equity came after the termination discussion when Dr. Gokal was stating that he was going to go to the media because he wasn't happy with his termination. . . .
>
> I was trying to inform him that based on equity in the news, the media was concerned with people getting doses equitably, and for

30

him—for the picture of him that he presented to me, which was he took the one dose used vial, threw it in his backpack, drove across town, gave it to friends and family, who happened to be all of one national—national origin or—or however you want to describe it, that might be seen as a nonequitable distribution. . . . I didn't want him to go out there and start making comments that could potentially come back and hurt him. I was trying to make him understand that he might want to think about it . . . .

Gokal has not disputed Anderson's description of the context in which he made the comment. Anderson's comment, considered in context, was only a description of how the media might perceive Gokal's actions and did not necessarily reflect Anderson's personal views; the comment, considered in context, did not show a discriminatory animus.

Even if Anderson's comment showed a discriminatory animus, the comment still does not raise a fact issue as to whether discrimination was a motivating factor for Gokal's termination. Harris County produced evidence that McClendon decided before the meeting in which Anderson made the comment, that if the allegation that Gokal took vaccine doses home was true, Gokal would be fired. Anderson said that McClendon and Sims made the decision to terminate Gokal, and they had "predetermined" before the meeting with Gokal that if the allegation that Gokal took vaccine doses home turned out to be true, then Gokal would be fired. Anderson said that he came to the meeting with Gokal with the termination letter in hand, but he was not going to give the letter to Gokal unless Gokal admitted to taking the vaccine doses home. Thus, Harris County produced evidence that Anderson's comment had

31

no influence over the decision to terminate Gokal because the comment was made after the decision to terminate was made.

Because Anderson's comment, when considered in context, does not show discriminatory animus, and even if it did, Anderson made the comment after the decision to terminate was made, Gokal has not raised a fact issue as to whether discrimination was another motivating factor for his termination.

\* \* \*

We are not unsympathetic to Gokal's actions. The COVID-19 pandemic created unprecedented difficulties and ethical questions. When COVID-19 vaccinations first became available, many people were desperate to be vaccinated, especially people who were particularly susceptible to complications from contracting COVID-19—like the people Gokal vaccinated. Although not relevant to our decision today, both the Harris County District Attorney's Office and the Texas Medical Association found no wrongdoing by Gokal. If the question before us was whether Harris County was justified in firing Gokal for finding at-risk people to give vaccine doses to instead of wasting those doses, we might very well come up with a different answer than our outcome today suggests. However, that is not the question before us. Instead, we are asked to decide whether Gokal has presented evidence that Harris County fired him because of his race or national origin. We conclude he has not.

Gokal has failed to produce evidence raising an issue of material fact showing that the county's stated reason for terminating his employment was a pretext or that discrimination was another motivating factor for his termination. *See Goudeau*, 793 F.3d at 475; *Clark*, 544 S.W.3d at 782. Therefore, he has not met his burden to produce sufficient evidence under the *McDonnell-Douglas* framework to survive a plea to the jurisdiction. *See Clark*, 544 S.W.3d at 783–84. Accordingly, the trial court erred in denying the county's plea to the jurisdiction. We sustain the county's sole issue.

Gokal has requested an opportunity to replead. However, when, as here, a plea to the jurisdiction challenges the existence of jurisdictional facts and the evidence fails to raise a fact question on the jurisdictional issue, we must rule on the plea to the jurisdiction as a matter of law. *See Miranda*, 133 S.W.3d at 228. When the governmental unit has asserted its immunity in the trial court and the plaintiff fails to show facts demonstrating a waiver of immunity after having a reasonable opportunity to amend his pleadings and conduct discovery directed to the issue, then the plaintiff's claims should be dismissed. *See Tex. Dep't of Crim. Just.-Cmty. Just. Assistance Div. v. Campos*, 384 S.W.3d 810, 816 (Tex. 2012) (per curiam).

## CONCLUSION

We reverse the trial court's order denying Harris County's plea to the jurisdiction and render judgment dismissing Gokal's claim for lack of jurisdiction.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Hightower.

Justice Landau, dissenting.